**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

LINDA TRIETSCH                    :

    Plaintiff,                    :
                            Case No. 3:09cv00413

 vs.                    :

                                 District Judge Walter Herbert Rice
MICHAEL J. ASTRUE,                    :    Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                    :

         Defendant.                    :

---

**REPORT AND RECOMMENDATIONS[1]**

---

## I.    INTRODUCTION

In March 2006 Plaintiff Linda Trietsch's health problems led her to seek financial assistance from the Social Security Administration by applying for Disability Insurance Benefits (DIB). She asserted in her application that she was eligible to receive DIB because starting October 6, 2005, she had been under a disability due to a bulging disc, arthritis, myotonia, Raynaud's Syndrome, and carpal tunnel.[2] (Tr. 68).

After initial administrative denials of her DIB application, the matter proceeded to

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] Myotonia refers to "[t]onic-spasm of a mental or temporary rigidity after muscle contraction." Taber's Cyclopedic Medical Dictionary at 1351 (19th Ed. 2001). Raynaud's disease or phenomenon involves "[s]pasms of arterioles, usually in the digits and occasionally in other acral parts (e.g., nose, tongue), with intermittent pallor or cyanosis." The Merck Manual at 1790 (17th Ed. 1999).

a hearing before Administrative Law Judge (ALJ) James I.K. Knapp. (Tr. 387-415). ALJ Knapp later issued a written decision denying Plaintiff's DIB application based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 25).

The ALJ's nondisability determination and the resulting denial of DIB later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. # 6), the Commissioner's Memorandum in Opposition (Doc. # 8), Plaintiff's Reply (Doc. # 11), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits. The Commissioner seeks an Order affirming the ALJ's decision.

## II.     BACKGROUND

### A.     <u>Plaintiff's Background and The Administrative Hearing</u>

Plaintiff was fifty-three years old at the time of the ALJ's decision. She is consequently considered to be a person "closely approaching advanced age" under Social Security Regulations. *See* 20 C.F.R. §404.1563(d); *see also* Tr. 32.

Plaintiff has a high school education. *See* 20 C.F.R. § 404.1564(b)(4); *see also* Tr. 73. She worked over the years as an assembler and a warehouse clerk. (Tr. 69, 75-81). During the administrative hearing, Plaintiff explained that she had worked as a warehouse

worker for twenty years but stopped in October 2005 due to low back pain.  (Tr. 391).  In April 2008 she tried working part time (six to eight hours a week) at home as a telephone solicitor.  (Tr. 392).  Four months later she stopped because numbness in her hands from myotonia congenita made it difficult for her to hold a telephone.[3]  (Tr. 394, 400).

Plaintiff also testified that at the time of the administrative hearing her hands continued to lock up three to four days a week.  (Tr. 401).   When this occurred she had a hard time forcing her hands to open.  (Tr. 401).  On some days her hands locked up three or four times a day.  Plaintiff further explained that she suffered from charley horses in her legs, toes, and ankles due to myotonia congenita.  (Tr. 394).

Plaintiff also reported a history of hand surgeries (both hands) in 1999 for carpal tunnel syndrome.  (Tr. 394).  Her wrists had continued to hurt since the surgeries.  Plaintiff also testified to constant pain in her low back that radiated down to her left foot.  (Tr. 402).  She had been taking prescribed medication to control her pain until January 2008 when she had to stop because of interaction with her prescribed anti-depressant medication.  (Tr. 393).  She then just took Advil or Tylenol and used an ice pack.  (Tr. 392).

Plaintiff further testified about experiencing depression.  When depressed she felt sad and overwhelmed and was easily aggravated.  (Tr. 395).  She had been taking

---

[3] Myotonia congenita is a "benign disease characterized by tonic [tension or contraction] spasms of the muscles induced by voluntary movements.  The condition is usually congenital...."  Taber's Cyclopedic Medical Dictionary at 1351, 2113.

anti-depressant medication since her husband died in 2006.  (Tr. 395-96).

As to her daily activities, Plaintiff watched television and performed light housework such as preparing meals, cleaning her dishes, sweeping, and minimal vacuuming.  (Tr. 396).  She also took care of her laundry and went shopping once or twice a week.  She visited her mother weekly at a nursing home and also visited frequently with her sister and sister-in-law.  She used a riding mower to mow her two-acre yard.  She did not nap during the day, and she slept six to seven hours during the night.  (Tr. 396-99).

Plaintiff estimated that she could walk less than a block and stand about ten to fifteen minutes at a time.  (Tr. 399).  She could sit for an hour at a time.  She explained that five years earlier her former hand specialist, Dr. Bamberger, had restricted her to lifting ten pounds.  (Tr. 399-400).

A vocational expert also testified during the administrative hearing.  He was asked to consider a hypothetical individual of Plaintiff's vocational profile who was limited to light work that involved no crawling, climbing ladders or scaffolds, crouching or stooping; occasional handling, feeling and fingering with each hand; no unprotected heights, moving machinery, cold temperature extremes or exposure to significant vibration; no complex instructions; occasional contact with the public, supervisors and the public; low stress and no fixed production quotas or otherwise above average pressure for production; and work that was not other than routine or hazardous.  (Tr. 411).  The vocational expert testified that such a hypothetical person could perform jobs at the light

4

exertional level (including usher, tanning salon attendant, and hostess).  About 5,000 such jobs were available in the regional economy, according to the vocational expert.  *Id.*

Upon cross-examination, Plaintiff's counsel asked the vocational expert to further consider a hypothetical person limited to occasional fingering, handling, and feeling.  The vocational expert testified, "you're really looking at more of the interacting and dynamics of somebody at a light level."  (Tr. 413).  He further stated, "they're all really going to be dealing with people," and "[i]t's more verbally oriented occupations as opposed to manually oriented occupations."  *Id.*

### B.    Medical Evidence

The parties have provided detailed and informative descriptions of Plaintiff's medical records supported with many specific citations to evidence of record.  *See* Doc. # 6 at 42-48 and Doc. # 8 at 62-65.  In light of this and upon the Court's consideration of the record as a whole, there is no need to expand upon the parties' well-written factual descriptions.   A brief summary of the medical opinions suffices.

**Amrula Sinha, M.D.**  Plaintiff's physician Dr. Sinha treated Plaintiff since May 2007 for back pain, depression, and cellulites.  (Tr. 373-78).  On August 15, 2008, Dr. Sinha opined that Plaintiff's chronic back pain was debilitating and would require special allowances in her schedule.  According to Dr. Sinha, Plaintiff could not be prompt and regular in attendance.  She could not lift more than five pounds.  Her ability to stand/walk was not affected by her impairment, but she could stand/walk two to three hours a day.  She could sit eight hours a day.  She could never climb or crawl; she could occasionally

5

balance, stoop, crouch and kneel; and she had to avoid heights, moving machinery, temperature extremes, and vibration.  And she could not perform prolonged standing or lifting.  (Tr. 379-86).

**State Agency Opinion**.  In February 2008 a physician reviewed the record for the Ohio Bureau of Disability Determination.  This non-examining physician determined that Plaintiff could lift/carry ten pounds frequently and twenty pounds occasionally; she could stand, walk and/or sit for six hours a day; she could frequently climb, balance, kneel and crawl; and she could occasionally stoop and crouch.  (Tr. 352-59).

**Medical Expert Testimony**.  Hershel Goren, M.D. testified as the medical expert during the administrative hearing.  (Tr. 403-08).  Dr. Goren thought that Plaintiff's impairments included myotonia congenita, which the Listing of Impairments in Social Security Regulations, does not specifically describe.  Dr. Goren therefore evaluated Plaintiff's impairments under Listing 11.13 ("Muscular dystrophy with disorganization of motor function...").  He considered Plaintiff's Raynaud's phenomena under Listing 14.04(d).  (Tr. 404).  He evaluated Plaintiff's ulnar neuropathy and carpal tunnel syndrome under Listing 11.14.  He reviewed Plaintiff's depressive disorder under Listing 12.04(a)(1).   He further considered pain disorder associated with psychological factors and general medical condition under Listing 12.07.  Dr. Goren further testified that Plaintiff's conditions did not meet or medically equal any Listing, but he believed she would have worksite restrictions.  Dr. Goren also testified that based on Plaintiff's testimony about her back pain and especially upon his review of the record, he did not

believe that her spine pain constituted a severe impairment.  (Tr. 405).

  According to Dr. Goren, Plaintiff could lift/carry twenty pounds occasionally and ten pounds frequently.  He based this exertional restriction on  Dr. Bamberger's assessment from July 7, 1997.  (Tr. 405, citing, Exhibit 6F, page 29).  Curiously, a careful reading of Exhibit 6F, page 29 (Tr. 200) does not reveal any specific numerical lifting restriction.  The notes instead show that Plaintiff was progressing slowly yet getting better, and she was on "light duty" (undefined in the notes) – but she was "not able to lift or do much activity."  (Tr. 200).  Notes dated September 8, 1997 indicate that Plaintiff was doing "about the same."  *Id*.  Plaintiff was apparently working again in March 1998 but was "not doing any heavy lifting."  *Id*.  Again, however, the notes do not explicitly state either the amount of weight or the frequency of lifting she was able to perform.  *Id*.

  Returning to the administrative hearing, Dr. Goren testified that Plaintiff's postural limitations included never climbing ladders, ropes or scaffolds and never balancing.  (Tr. 405).  Her manipulative restrictions were limited to occasional handling, fingering, and feeling with either hand.  Her environmental restrictions required her to avoid unprotected heights and concentrated exposure to extreme cold.  (Tr. 406).

  Dr. Goren also opined that Plaintiff's mental restrictions would be two-fold.  First, according to Dr. Goren, Plaintiff's work should not involve high-production quotas.  She consequently could not perform assembly line jobs or jobs requiring her to work at a piece rate.  *Id.*  Second, according to Dr. Goren, Plaintiff's interactions with others would need to be superficial.  Her interactions with supervisors, co-workers and with the general

public should exclude arbitration, negotiation, confrontation, supervision of others, or responsibility for the safety and welfare of others.  Dr. Goren provided an example of a type of superficial interaction that Plaintiff could perform as the interaction between a cashier and a customer.  *Id.*

On cross examination Plaintiff's counsel asked Dr. Goren, "that lumbar MRI from September '05 that had the central annular tear and disc protrusion as well as left foramina narrowing , disc bulge and facet arthrosis, that wouldn't be objective evidence of at least some complaints of pain?"  (Tr. 407).  Dr. Goren answered:  "Not really.  The – an abnormal MRI does not predict the spine pain.  And if pain is present, it does not predict the severity of the pain...."  *Id*.  Dr. Goren also thought that Plaintiff is more impaired by her myotonia congenita than by spine pain.  *Id.*

## III.    THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

### A.    The DIB Statute

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  A DIB applicant bears the ultimate

8

burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.  Social Security Regulations

Administrative regulations require ALJs to employ a five-Step sequential evaluation when resolving whether a DIB applicant is under a disability. *See* Tr. 17-19; *see also* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity,[4] can she perform her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

### C.     **ALJ Knapp's Decision**

The ALJ's significant findings, for present purposes, began at Step 2 of the sequential evaluation where he concluded that Plaintiff had severe impairments of "myotonia congentia, lumbar degenerative disc disease, bilateral carpal tunnel syndrome residuals, residuals of ulnar neuropathy, Raynaud's Phenomenon, and depressive and pain disorders NOS (not otherwise specified)." (Tr. 18).

The ALJ concluded at Step 4 that Plaintiff lacked the Residual functional capacity[5] to:

> "1) lift more than ten pounds frequently or twenty pounds occasionally; 2) crawl; 3) climb ladders or scaffolds; 4) crouch or stoop more than occasionally; 5) handle, feel, and/or finger with each hand more than occasionally; 6) work at unprotected heights, around moving machinery, in cold temperature extremes, or where she would be exposed to vibration on her upper extremities; 7) perform work involving complex instructions; 8) have more than occasional contact with the general public, supervisors and co-workers; or 9) do other than low stress work activity (i.e., no job involving fixed production quotas, or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous)."

(Tr. 21). Considering these abilities and limitations, together with Plaintiff's age, educational background, and work experience, ALJ Knapp found that she could perform a number of jobs that existed in the national economy. (Tr. 24). These, together with all ALJ Knapp's findings, led him to ultimately conclude that Plaintiff was not under a disability and was, therefore, not eligible to receive DIB. (Tr. 25).

---

[5] "Residual functional capacity" refers to a person's physical and mental abilities or what the individual can or cannot do despite his or her limitations. 20 C.F.R. §404.1545; *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

10

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. DISCUSSION

### A. The Parties' Contentions

Plaintiff contends that the ALJ erred by crediting the opinions of Dr. Goren and the state agency reviewing physician over the opinion of her treating physician, Dr. Sinha. Plaintiff emphasizes that Dr. Sinha actually treated and examined Plaintiff and that Dr. Goren did not even see Plaintiff at the administrative hearing (he testified by telephone), "so he certainly never treated her, and his "lengthy history of testifying" has absolutely no relevance." (Doc. #6 at 52). Plaintiff further argues that Dr. Goren did not even mention Dr. Sinha's opinion or office notes. And Dr. Goren did not give a reason as to specifically why Dr. Sinha's opinion should be rejected and in fact, he never actually saw or reviewed Dr. Sinha's opinion.

Plaintiff also argues that the ALJ erred in finding that Plaintiff could perform a significant number of jobs in the national economy based on the vocational expert's testimony.

The Commissioner argues that the opinion of Dr. Sinha was not entitled to controlling or deferential weight and that the ALJ properly weighed her opinion as

Social Security Regulations and Rules required.  According to the Commissioner, substantial evidence supports the ALJ's decision, particularly his reliance on Dr. Goren's opinions when assessing Plaintiff's residual functional capacity.  The Commissioner also argues that clinical evidence and the opinion of the state agency reviewing physician provided additional support for the ALJ's residual functional capacity determination.

### B.    Medical Source Opinions

#### 1.

The treating physician rule, when applicable, requires an ALJ to place controlling weight on a treating physician's opinions rather than favoring the opinion of a nontreating physician, a one-time examining physician, or a record-reviewing physician.  *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544.  Controlling weight applies under this rule only when the treating physician's opinions are both well supported by medically acceptable data and are not inconsistent with other substantial evidence of record.  *See Blakley,* 581 F.3d at 406; *see also Wilson*, 378 F.3d at  544.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

13

More weight is generally given to the opinions of examining physicians than is given to the opinions of non-examiners. *See* 20 C.F.R. §404.1527(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *8 (July 2, 1996). Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §404.927(d), (f); *see also* SSR 96-6p, 1996 WL 374180 at *2-*3.

**2.**

The ALJ recited the correct legal criteria applicable to weighing the opinions of a treating physician. (Tr. 22). The main issues, then, are whether the ALJ actually applied the correct legal criteria to the evaluation of the medical source opinions and whether substantial evidence supports the ALJ's evaluation.

The ALJ considered the opinions of Dr. Sinha and Dr. Goren as follows:

> I decline to give Dr. Sinha's opinion either controlling or deferential or other special weight under the Regulations. It lacks necessary supportability and consistency with the record. Dr. Sinha has had only limited personal contact with the claimant over the course of the longitudinal record and have not performed a detailed examination of claimant. (Exhibit 30F). He or she relies largely on claimant's low back condition for stating that claimant is limited to sedentary work and could

14

not be dependable and reliable in attendance.  (Exhibit 31F, page 2).  Yet the Medical Expert [Dr. Goren], a neurologist with a lengthy history of testifying for the Administration, did not even think that claimant's low back condition was severe (i.e., warranting work related restrictions) let alone disabling.  Claimant's primary problem has been with the use of her arms, and while I do not find a specific residual functional capacity from Dr. Bamberger in the record, I note that he had no objection to her working at the light level when he last saw her in late 2004 (Exhibit 6F, page 1).

(Tr. 22).

The ALJ fully credited the opinions provided by Dr. Goren because of his specialization as a neurologist, a proper consideration under the Regulations.  *See* 20 C.F.R. §404.1527(d)(5).  Contrary to Plaintiff's contention, the ALJ's other reason – Dr. Goren's his "lengthy history of testifying for the administration" – can be a proper factor to consider under the Regulations.  Under the heading, "Other factors," the Regulations allow the ALJ to consider "any factors" brought to his attention or any factors "of which [he is] aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in the case record are relevant factors that we will consider in deciding the weight to give a medical source opinion."  20 C.F.R. §404.1527(d)(6).  The ALJ's decision, however, does not explain why these arguably permissible factors led him to fully credit Dr. Goren's opinion.  An explanation by the ALJ was essential in the present case.

Dr. Goren testified, "the Claimant should be restricted to lifting or carrying 20

15

pounds occasionally and 10 pounds frequently.  That exertional restriction is what Dr.

Bamberger gave on July 7, 1997 at [Exhibit] 6F, page 29.  There would be no other

exertional restrictions." (Tr. 405).  Yet a careful reading of Dr. Bamberger's July 7, 1997

notes fails to reveal this exertional restriction.  Dr. Bamberger makes no mention of a

specific amount of weight or frequency of lifting that Plaintiff was restricted to.  *See* Tr.

200.  Dr. Bamberger noted, "We need to keep her on light duty for another 2 months."

*Id*.  Dr. Bamberger's notes did not define what he meant by "light duty," and he did not

otherwise indicate that Plaintiff could lift 20 pounds occasionally and 10 pounds

frequently.  *See id*.  Although Dr. Goren apparently concluded that Dr. Bamberger's

"light duty" reference to be the same as the Regulation's definition of "light work," *see*

20 C.F.R. §404.1567(b), Dr. Bamberger's notes simply lack sufficient information to

support Dr. Goren's conclusion.  *See* Tr. 200.  Dr. Goren, moreover, provided no

meaningful explanation of his opinions and instead provided little but his conclusions.

For example, he testified that Plaintiff's conditions did not meet certain Listing-level

impairments without explaining why.  Except for Dr. Bamberg's July 7, 1997, Dr. Goren

failed to point to any evidence in support of the work restrictions he believed Plaintiff

had, and he provided no neurological or other medical reason to support his opinions.  *See*

Tr. 405-06.  Instead, his surprisingly brief testimony – which the ALJ fully credited –

consisted of several paragraphs, part of which was not supported by the evidence (Dr.

Bamberger's 7/7/97 note) Dr. Goren cited.  *See* Tr. 404-05.  One would expect much

more from a neurologist who has a lengthy history of testifying during social security

16

hearings.

The last point aside, under the Regulations and case law, it was not enough for the ALJ to single out two factors – specialization and lengthy history of testifying – as a basis for crediting Dr. Goren's opinions without also considering his opinions under the regulatory factors that detracted from his opinions, such as "supportability" and "consistency."  *See* 20 C.F.R. §404.1527(d)(3)-(4); *cf. Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *cf. also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).  The Regulations and Rulings, moreover, required the ALJ to weigh Dr. Goren's opinions under the same regulatory factors that are applicable to treating medical source opinions. *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p, 1996 WL 374180. The Regulations appear to emphasize this requirement by reiterating it no less than three times.  *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same). The ALJ erred by failing to do so in the present case.

The Commissioner contends, "The ALJ considered the record, evidence, including Sinha's opinion, and reasonably concluded that Plaintiff had the [residual functional capacity] to perform a reduced range of light work."  (Doc. #8 at 72).  As discussed

17

above, Dr. Sinha provided an assessment of Plaintiff's functional capacity in August

2008. (Tr. 379-86). Dr. Sinha believed that Plaintiff had the ability to walk/stand for

only two-three hours in an eight-hour workday and Plaintiff could not lift more than five

pounds, as well as additional limitations due to Raynaud's disease. *Id.* Dr. Sinha

reported that Plaintiff's back was limited to a range of motion of two degrees due to pain.

(Tr. 385). Dr. Sinha thus concluded that Plaintiff lacked the functional capacity to

perform the full range of sedentary work. *See* Tr. 386.

In rejecting Dr. Sinha's opinion, the ALJ relied on the opinions of Dr. Goren, the

nonexamining medical expert who testified at the hearing. (Tr. 21-22). Because the ALJ

did not evaluate Dr. Goren's opinion as the Regulations and case law require, and because

the evidence (Dr. Bamberger's 7/7/97 note) on which Dr. Goren relied did not support his

opinion, the ALJ's reliance on Dr. Goren's opinion to discount Dr. Sinha's opinion was

misplaced.

The Commissioner contends that clinical and diagnostic findings in the record did

not support Dr. Sinha's opinion. Although the Commissioner cites to specific evidence in

the administrative record, *see* Doc. #11 at 71-72, the Commissioner overlooks other

clinical, diagnostic, or opinion evidence, the bulk of which confirms Dr. Sinha's opinions.

An MRI of Plaintiff's spine performed on October 4, 2007 showed a mild disc

bulge containing an annular tear at L4-5,[6] and other spinal abnormalities including, but

_____

[6] Plaintiff points out that an annular tear is generally described as:

18

not limited to, "the beginning of a perineural cyst" near the L4-5 near root.  (Tr. 303).

Additionally, the administrative record contains records of Plaintiff's carpal tunnel surgery in January and February 1999 and ulnar nerve transposition of the right elbow on March 1997.  She also had a history of myotonia and Raynaud's syndrome.  (Tr. 153).  A June 2003 EMG that revealed "mild residual bilateral carpal tunnel syndrome.  There [was]left cubital tunnel syndrome noted" and it also "demonstrated diffuse myotonic discharges in all of the tested muscles."  (Tr. 158).  Dr. Kim, an orthopedic hand surgeon, stated that the myotonia "could account for some of the diffuse musculoskeletal symptoms she has had over the years."  (Tr. 157).

June 2005 EMG showed "mild bilateral median mononeuropathy at the wrist" and some slowing of the ulnar nerves both wrists.  (Tr. 224).  It was noted, "The patient did have myotonic potentials throughout the tracing that are consistent with her diagnosis of myotonia congenital."  *Id*.  An MRI done on September 29, 2005 demonstrated, "L5-S1

---

"'[A] lesion labeled annuular tear or internal disruption is based on concept of leaking disc, one which permits the irritating liquid material normally restricted to the center of the disc to come into contact with the innervated tissue; annular tissue that permits egress of this liquid has a poor capacity for healing; at most, a thin layer of scar tissue at the periphery of the tear may seal the leak but leave the disc highly susceptible to retearing; where as herniated disc has a significant capacity to be resolved w/ time, annular tear continues to produce symptoms indefinitely clinical picture is based on pain related to increased intradiscal pressure and irritability of neural structures; annular tear is usually produced by injury that increases intradiscal pressure significantly; predominant element in the history is back pain, either alone or in excess of leg pain; leg pain may be either unilateral or bilateral; increases in intradiscal pressure exacerbate the pain….'"

(Doc. #11 at 85 (quoting http://www.wheelessonline.com/ortho/annular_tear).

19

left foramina narrowing by combination of disc bulge and facet arthrosis….Central anular tear anad minimal central disc…." (Tr. 229).  A November 2005 EMG of Plaintiff's left lower leg and lumbar spine showed diffuse myotonic discharges throughout.  (Tr. 231). An EMG in May 2007 indicated myotonia and also revealed "[p]rolonged distal latencies of both median nerve is secondary to effect of cold.  These are residuals of previous carpal tunnel syndrome." (Tr. 273).

A neurologist, Dr. John Kissel, diagnosed that Plaintiff had myotonia congenita based on her clinical and EMG findings.  (Tr. 368).  He also wrote:

> "Another aspect to her history is the multiple entrapments.  This always raises the question of a genetic neuropathy with predisposition to pressure palsies, but this may simply be a manifestation of her myotonia and excessive exercise and hand use."

(Tr. 368).

Dr. Sanford Wolfe, a rheumatologist, evaluated Plaintiff on September 15, 2003. Plaintiff had trigger points and she had thickening of her right second and fourth palmer tendons and the left third and fifth palmer tendons.  (Tr. 167).  He wrote:  "The symptoms that Mrs. Trietsch currently has may very well be due to myotonoia or myotonic dystrophy which is felt to be a more mild and chronic form of muscular dystrophy. Basically, myotonia is a neurologic disorder...."  (Tr. 168).  Dr. Demirjion, a pain management specialist, submitted Plaintiff's records dated November 8, 2005 through March 20, 2006.  On November 8, 2005, Plaintiff had a reduced range of motion of her lumbar spine.  The diagnosis was "[m]ultfactorial problem with diskogenic disease and

facet disease, foraminal narrowing." (Tr. 246).

On December 19, 2005, her examination showed myotonia in all muscles. The diagnosis was "[l]umbar diskogenic disease, facet narrowing, foraminal narrowing, myotonia." (Tr. 241). Dr. Demirjion found that Plaintiff, on March 20, 2006, had a reduced range of motion of her lumbar spine. She had myotonia and some atrophy in her hands. The diagnosis was "lumbar spine and sacroiliac joint disease, and spondoylosis." (Tr. 234).

In early December 2006 Plaintiff underwent a preoperative assessment for Dr. Rothstein. She had decreased sensation, absent Achilles reflex bilaterally, positive straight leg raising on the left, decreased strength, abnormal heel and toe walk, and lumbar tenderness. (Tr. 255-256).

Office notes, dated June 6, 2002 through June 1, 2006, were submitted by Dr. Derksen. By 2005, she was diagnosed with carpal tunnel syndrome and ulnar nerve entrapment as well as her myotonia. She had decreased grip strength, tenderness, and positive trigger point. (Tr. 285-286). On October 7, 2005, Plaintiff was seen for back pain. She had decreased range of motion, reduced reflexes, reduced range of motion of her left leg, some weakness in her left leg, spasm, positive straight leg raising test on the left. (Tr. 276-278, 280, 282-84). This clinical findings support Dr. Sinha's opinion of disability.

Accordingly, Plaintiff's contentions that the ALJ erred by rejecting the opinions of her treating physician and by instead relying on Dr. Goren's opinion and the opinions of

21

the on-examiners are well taken.

## VI.    DIB AWARD IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are

not supported by substantial evidence, the Court must decide whether to remand the case

for rehearing or to reverse and order an award of benefits.  Under sentence four of 42

U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's

decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*,

501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous

principle of law, failed to consider certain evidence, failed to consider the combined

effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of*

*H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

An Order remanding for payment of benefits is only warranted "where proof of the

disability is overwhelming or where the proof of disability is strong and evidence to the

contrary is lacking." *Faucher*, 17 F.3d at 176.  A judicial award of benefits is warranted

in the present case because the evidence supporting the existence of Plaintiff's disability

is strong while contrary evidence is lacking.  The strong evidence consists of the opinion

provided by Dr. Sinha as well as evidence contained in the longitudinal medical record.

Plaintiff has seen rheumatologists, orthopedic specialists, pain specialists, neurologists,

and a chiropractor in the hopes of improving her impairments.  (Tr. 153, 154, 164, 172,

233, 247, 258, 298, 305, 360-61).  She has undergone many objective tests with abnormal

22

results, detailed above, and the longitudinal record supports her claims of disability and the opinion of her treating physician that she is disabled from work activity.  The administrative record, moreover, does not contain a report by a treating or examining physician who believes that Plaintiff has the residual functional capacity for light work or for the restricted range of light work set by the ALJ in his assessment of Plaintiff's residual functional capacity.  Consequently, "[A]ll essential factual issues have been resolved and the record adequately establishes ... plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176; *see Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990).  Based on the residual functional capacity assessment of Dr. Sinha and Rule 201.14 of the Medical-Vocational Guidelines, 20 C.F.R. Subpart P, Appendix 2, Plaintiff was under a "disability" within the meaning of the Social Security Act beginning on her asserted disability onset date, October 6, 2005.

## IT IS THEREFORE RECOMMENDED THAT:

1.     The Commissioner's non-disability finding be vacated;

2.     Plaintiff's case be **REMANDED** to the Social Security Administration under Sentence Four of 42 U.S.C. §405(g) for payment of DIB consistent with the Social Security Act; and

3.     The case be terminated on the docket of this Court.

December 1, 2010                                    ____s/ Sharon L. Ovington_____
                                                                    Sharon L. Ovington
                                                          United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).